IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-00492-PAB-CBS

DONITA L. SELF,
    Plaintiff,
v.

I HAVE A DREAM FOUNDATION - COLORADO,
    Defendant.
_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

    This civil action comes before the court on Defendant's Motion to Dismiss and/or for Summary Judgment. Pursuant to the Order of Reference dated March 2, 2011 (Doc. # 2) and the memorandum dated May 3, 2012 (Doc # 87), this matter was referred to the Magistrate Judge. The court has reviewed the Motion, Ms. Self's Responses (filed on June 5, 2012 (Doc. # 89) and June 6, 2012 (Doc. # 90)), Defendants' Reply (filed July 2, 2012) (Doc. # 94), the exhibits and affidavits, the entire case file, and the applicable law and is sufficiently advised in the premises.

I.    Statement of the Case

    Through counsel, Ms. Self filed her initial Complaint on February 28, 2011. (*See* Doc. # 1). On April 13, 2012, Ms. Self filed her First Amended Complaint. (*See* Docs. # 4, # 5). Ms. Self's Second Amended Complaint ("SAC") was accepted for filing on August 23, 2012. (*See* Doc. # 34).[1] Ms. Self brings two claims for relief under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, for discrimination and retaliation by her former employer, Colorado I Have A Dream Foundation ("CIHAD"). Ms. Self alleges that she was a qualified disabled individual under the ADA due to Chiari malformation, a skull abnormality. (*See*

---

[1]    Ms. Self has proceeded in her *pro se* capacity since her counsel withdrew from from representing her on October 7, 2011. (*See* Unopposed Motion to Withdraw as Attorney for Plaintiff (Doc. # 40); Minute Order granting Unopposed Motion to Withdraw as Attorney for Plaintiff (Doc. # 44)).

Doc. # 34 at 2-3, 8-9 of 13).  She alleges that Defendant regarded her as disabled, failed to reasonably accommodate her disabilities, created a hostile work environment, treated her disparately, and terminated her employment based on her disability and in retaliation.  (*See* Doc. # 34 at 2-3, 8-9 of 13).  Ms. Self seeks compensatory damages, back pay, front pay, back and front benefits, reinstatement to her employment, punitive damages, costs, pre- and post-judgment interest, and "a tax enhancement award."  (*See id.* at 11-12 of 13).  Defendant moves for dismissal of or alternatively for summary judgment on both of Ms. Self's claims.  Defendant argues that Ms. Self's claims fail both jurisdictionally and factually on the grounds that: (1) CIHAD is not an "employer" within the meaning of the ADA, having had at all relevant times fewer than fifteen employees; (2) she failed to exhaust her prerequisite administrative remedies because her Charge of Discrimination filed with the EEOC failed to allege retaliation and she did not file her Charge within 300 days of her termination, (3) she cannot establish that she has a disability or that CIHAD failed to accommodate her disability, (4) she cannot establish that Defendant's proffered legitimate, non-discriminatory reasons for terminating her employment were a pretext for discrimination based on her disability, (5) she cannot establish that she was terminated in retaliation for any protected activity, and (6) she cannot establish the existence of a hostile work environment.

II.     Standard of Review

Defendant argues that this court lacks subject matter jurisdiction over Ms. Self's retaliation claim because she failed to exhaust the prerequisite administrative remedies.  Defendant also argues that the court lacks subject matter jurisdiction over both of Ms. Self's claims because CIHAD does not meet the statutory definition of an employer under the ADA.  A claim may be dismissed if the court does not have subject matter jurisdiction over it.  Fed. R. Civ. P. 12(b)(1). "Generally, a dismissal for lack of subject matter jurisdiction is without prejudice and does not have a preclusive effect."  *Garman v. Campbell County Sch. Dist. No. 1*, 630 F.3d 977, 985 (10th Cir. 2010).  *See also Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("[W]here the district court dismisses an action for lack of jurisdiction . . . the dismissal must be

without prejudice.").

> The purpose of a summary judgment motion is to assess whether trial is necessary. Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that issues of undetermined material fact exist. A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial.

*Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121 (D. Colo. 2000) (internal quotation marks and citations omitted). In this procedural posture, therefore, the court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain h[is] claim." *Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) (internal quotation marks and citation omitted). While the court must view the facts in the light most favorable to the plaintiff, *A.B. ex rel. B.S. v. Adams-Arapahoe 28J School District*, 831 F. Supp 2d 1226, 1258 (D. Colo. 2011), nevertheless, a "plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

III. Factual Background

Ms. Self is a Caucasian female who was employed as office manager for CIHAD from November 29, 2000 to October 13, 2008, when she was terminated from her employment. (*See* SAC at ¶¶ 9, 30). CIHAD is a non-profit organization providing long-term intervention to disadvantaged youth with a goal of increasing high school graduation rates through mentoring and support to students. (*See* Affidavit of Mary Hanewall dated April 13, 2012, Exhibit A to Defendant's Motion (Doc. # 84-1) at ¶ 1). Ms. Hanewall is the Executive Director of CIHAD and hired Ms. Self as office manager. (*See id.* at ¶¶ 1, 7). Ms. Hanewall was responsible for reviewing and evaluating Ms. Self's job performance. (*See id.* at ¶ 7).

As early as 2005, Ms. Self received coaching concerning her ability to do her job. (*See id.* at ¶ 8; September 20, 2011 Deposition of Donita Self, Exhibit C to Defendant's Motion (Doc. # 90) at 110 of 202). In September 2007 she received verbal and written counseling concerning her job performance. (*See id.*). Ms. Hanewall and others at CIHAD perceived that Ms. Self

acted more as an administrative assistant than an office manager. (*See id.*; September 20, 2007 Memo to Ms. Self from Ms. Hanewall, Exhibit B to Defendant's Motion (Doc. # 86-2); Doc. # 86-3 at 2-5 of 25; Doc. # 90 at 111, 115-16, 118 of 202 (acknowledging receipt and substance of Exhibit B)). Ms. Self did not perceive the September 20, 2007 Memo as addressing shortcomings in her work performance. Rather, Ms. Self believed that Ms. Hanewall was upset with her for seeking additional employment outside CIHAD. (*See* Doc. # 90 at 112-13, 115, 119-20, 122, 129 of 202; Doc. # 89 at 25 of 95).

Ms. Self alleges that on approximately June 6 or June 7, 2008, she began to experience what she believes were symptoms of Chiari malformation. (See Doc. # 86-3 at 6 of 25). Ms. Self began to experience back pain and difficulty walking and lifting. (*See id.* at 7 of 25). In early July 2008, Ms. Self advised Ms. Hanewall that she was having difficulty lifting heavy objects because of her back pain. (*See id.* at 8 of 25). Ms. Self told Ms. Hanewall that "she was experiencing problems with headaches, as well as difficulties with dizziness and pain in her back." (*See* Doc. # 86-1 at ¶ 9). "Ms. Self expressed frustration that her doctors had been unable to diagnose what her problems might be. . . ." (*See id.*). Ms. Hanewall "advised Ms. Self that she could refrain from some of the more physically demanding aspects of her job, specifically any type of heavy lifting or the grocery shopping at Sam's Club." (*See id.*; Doc. # 86-3 at 9-10, 14 of 25). Ms. Hanewall agreed to excuse Ms. Self from attending a CIHAD annual event held at Water World in the summer of 2008 and a Board meeting in September 2008. (*See* Doc. # 86-3 at 19-21 of 25). Between June 2008 and October 2008, Ms. Self was permitted to attend numerous medical appointments during work hours. (*See id.* at 22-23 of 25).

On October 7, 2008, Ms. Hanewall learned that Ms. Self had run a report tracking the volunteer contacts and activities of CIHAD's volunteer coordinator, Darcie Ezell. (*See* Doc. # 86-1 at ¶ 10; Report, Exhibit D to Defendant's Motion (Doc. # 86-6); Doc. # 86-4 at 18 of 25). Running the report was not within Ms. Self's job duties. (*See* Doc. # 86-1 at ¶ 10). Ms. Hanewall was concerned that the report could be construed as criticism of Ms. Ezell's work. (*See* Doc. # 86-1 at ¶ 10; Doc. # 86-5 at 3 of 8). Ms. Self showed the volunteer report to Sara Ewing, one of CIHAD's project coordinators, and to other project coordinators. (*See* Doc. # 86-1

at ¶ 10). Ms. Hanewall also became aware of allegations that Ms. Self had generated rumors in the workplace that Amy Farnan, CIHAD's development director, had been promised Ms. Hanewall's job when she retired and that Peter Noel, a project coordinator, was not putting in sufficient hours or was "slacking" on the job, as well as an allegation that Ms. Self had shared information regarding Mr. Noel's salary with other employees. (See Doc. # 86-1 at ¶ 11; Doc. # 89 at 26, 33, 51, 54, 56-57 of 95).

While investigating the complaints about Ms. Self's behavior in the workplace, Ms. Hanewall spoke to "most of the CIHAD employees and volunteers who were implicated." (*See* Doc. # 86-1 at ¶ 12). Ms. Hanewall met with Ms. Self on October 8, 2008 at Mountain States Employers Council ("MSEC"). (*See* Doc. # 86-1 at ¶12). One of MSEC's employees, Deborah Brackney, also attended the meeting. (*See id.*). In the meeting, Ms. Self generally denied any improper conduct. She denied that she had produced the report on Ms. Ezell's activities, even though the annotations on the report were in her handwriting. (*See* Doc. # 86-1 at ¶12). Ms. Self does not dispute that Ms. Hanewall legitimately investigated complaints about her behavior in the workplace. (*See* Doc. # 86-4 at 22-24 of 25). Ms. Self believes that several employees conspired against her to make these complaints because she had expressed complaints about them to Ms. Hanewall. (*See* Doc. # 86-5 at 1-2 of 8; Doc. # 90 at 172, 174 of 202). Ms. Self understood that Ms. Hanewall was addressing a perception among her coworkers that she could not be trusted. (*See* Doc. # 86-5 at 2-3 of 8). Ms. Self acknowledges that it was Ms. Hanewall's job and responsibility to investigate these issues and agreed that Ms. Hanewall was not retaliating against her. (*See id.* at 3 of 8). Ms. Self agreed that for an office manager to share information about another employee's salary, imply that an employee was not doing his work, or create friction between employees would be inappropriate conduct that could be grounds for termination from employment. (*See* Doc. # 86-4 at 19-21 of 25). During the October 8, 2008 meeting, Ms. Self accused Ms. Hanewall of behaving maliciously, vindictively and with favoritism to other employees during the past eight years of her employment at CIHAD. (*See* Doc. # 86-1 at ¶ 12; Doc. # 90 at 176-80 of 202).

Upon completion of her investigation, Ms. Hanewall "concluded that the trust of key staff

in Ms. Self, particularly given the nature of her position as office manager responsible for handling confidential personnel information, had been irreparably damaged." (*See* Doc. # 86-1 at ¶ 13). Based on Ms. Self's behavior in the workplace "that seemingly fostered human resources conflicts, rather than helping to ameliorate them, as well as her deteriorating interpersonal skills and the performance issues that had been ongoing since at least September 2007," Ms. Hanewall terminated her employment on October 13, 2008. (*See* Doc. # 86-1 at ¶ 13; Doc. # 90 at 167 of 202). Ms. Self executed a Charge of Discrimination with the EEOC on August 17, 2009. (*See* Doc. # 86-7).

IV.   Analysis

A.   Employer Within the Meaning of the ADA

Defendant moves for summary judgment on both of Ms. Self's claims because she cannot establish that CIHAD was an employer under the ADA. The ADA states in pertinent part that "[t]he term 'employer' means a person engaged in an industry effecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. . . ." 42 U.S.C. § 12111(5)(a). Whether CIHAD was an employer within the ADA's statutory definition "presents a question of subject matter jurisdiction." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 978 n. 2 (10th Cir. 2002). *But see, Montoya v. A & M Apartments, Inc.*, 2012 WL 5332203, at * 1 n. 1 (D. Colo. Oct. 29, 2012) ("The threshold number of employees in Title VII and the ADA's definition of employer is not jurisdictional but, rather, an element of the claim for relief.") (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 503 (2006)). Whether the ADA's statutory definition is jurisdictional or an element of her claims, Ms. Self does not sufficiently demonstrate that CIHAD met the definition of an employer during the relevant time period. *See Binns v. Primary Group, Inc.*, 23 F. Supp. 2d 1363, 1366 (M.D. Fla. 1998) ("Plaintiff must demonstrate that Defendant had fifteen or more employees in order to be held liable under the ADA").

CIHAD presents its payroll records as evidence that from 2007 to 2009 CIHAD had no more than twelve employees. (*See* Doc. # 86-1 at 8-9 of 9; Exhibit F to Defendant's Motion

(Docs. # 86-8, # 86-9); Doc. # 86-4 at 3-6 of 25). The payroll records reflect regular employees and several temporary employees "who were on the payroll as hourly employees for limited periods of time for specific projects." (*See* Doc. # 86-1 at ¶ 2). The payroll records also "identify those individuals performing services at CIHAD while serving as AmeriCorps volunteers." (*See id.* at ¶ 3). Ms. Self argues that AmeriCorps participants volunteering at CIHAD must be considered employees of CIHAD. The evidence and legal authority do not support Ms. Self's argument.

The AmeriCorps program is a creation of the National and Community Service Act of 1990 ("NCSA"), 42 U.S.C. § 12501, *et seq.* AmeriCorps volunteers provide volunteer services in exchange for education awards through the federal AmeriCorps program, 42 U.S.C. § 12591(a). (*See id.* at ¶ 5). The AmeriCorps volunteers at CIHAD were placed by the Colorado Campus Compact ("CCC"), a program of Regis University which hosts the UCAN Serve AmeriCorps program (now the Compact Service Corps Program), "a national service program that connects students and other volunteers with communities through meaningful service learning, civic engagement, and community service experiences." (*See id.* at ¶ 5; *see also* Affidavit of Stephanie Schooley dated April 20, 2012, Exhibit G to Defendant's Motion (Doc. # 86-10 at ¶ 1). "Regis receives a federal grant from the Corporation for National Community Service, an agency of the federal government, and, through the Colorado Campus Compact, hosts the UCAN Serve AmeriCorps program. . . ." (*See* Doc. # 86-10 at ¶ 1). "The grant Regis receives from the Corporation for National and Community Service is regionally coordinated by CCC as part of the AmeriCorps program." (*See id.* at ¶ 3).

"CIHAD receives AmeriCorps volunteers through the Regis grant" as both "a sub-grantee and a service site for AmeriCorps purposes and is fully qualified and eligible to serve in that capacity as a non-profit meeting the goals" of the UCAN Serve program and the Regis University grant. (*See* Doc. # 86-10 at ¶ 4; *see also* Doc. # 86-1 at ¶ 5; Doc. # 90 at 186-87 of 202). CCC approves all applicants for AmeriCorps service, including those that serve at CIHAD, and reviews their eligibility under the criteria governing the Regis University grant from the Corporation for National Community Service. (*See id.* at ¶ 6). The AmeriCorps "volunteers were placed at

CIHAD under the UCAN Serve AmeriCorps program" and "qualify as AmeriCorps volunteers." (*See* Doc. # 86-10 at ¶ 4).

AmeriCorps volunteers become eligible for educational awards funded through the CCC AmeriCorps program. (See Doc. # 86-10 at ¶ 7; 42 U.S.C. § 12602-12604; Doc. # 90 at 193 of 202). "These educational awards may be used by volunteers to pay for current educational expenses." (See Doc. # 86-10 at ¶ 7; 42 U.S.C. § 12604). "The educational awards can additionally be used to repay existing school loans and can also be used in the future for up to seven years to pay for further or future education." (*See id.*). AmeriCorps volunteers must complete 1700 hours of service in one year to qualify for an education award at the completion of their volunteer service. (*See* 42 U.S.C. § 12593(b); Doc. # 86-1 at ¶ 5). AmeriCorps volunteers are also eligible for a stipend or living allowance from the grantee/sub-grantee or service site. (See Doc. # 86-10 at ¶ 9; Doc. # 86-1 at ¶ 5; 42 U.S.C. § 12594; Doc. # 90 at 192, 198 of 202). AmeriCorps volunteers at CIHAD received a living allowance in addition to the education awards they earned at the completion of their volunteer service. (See Doc. # 86-1 at ¶ 5). Living allowances are not considered a wage, nor can any AmeriCorps volunteer be paid any type of hourly wage. 45 C.F.R. § 2522.245. AmeriCorps volunteers are not eligible for overtime pay and do not receive CIHAD's employee handbook. (*See* Doc. # 86-1 at ¶ 5). "CCC and/or sub-grantee staff conducts orientations with all AmeriCorps volunteers it places, provides training and technical assistance, provides a specific Member handbook and policies, including grievance procedures and is otherwise responsible for the volunteers." (*See* Doc. # 86-10 at ¶ 10). Any decisions regarding discipline or termination of AmeriCorps volunteers were discussed with and approved by Ms. Schooley, the CCC Grant Administrator for AmeriCorps at Regis University. (*See* Doc. # 86-1 at ¶ 5; Doc. # 86-10 at ¶ 10).

The express language of the NCSA indicates that AmeriCorps volunteers cannot be considered employees of the organization where they are volunteering. "A participant shall not be considered to be an employee of the program in which the participant is enrolled." 42 U.S.C. § 12511(17)(B) (2004). Congress later amended the NCSA to provide that a participant "shall not be considered to be an employee of the organization receiving assistance under the national

service laws through which the participant is engaging in service." 42 U.S.C. § 12511(30)(B) (2009). *See also* 42 U.S.C. § 12655n(b)(1) ("Except as otherwise provided in this subsection, a participant or crew leader in a program that receives assistance under this subtitle [42 U.S.C. § 1255 *et seq.*] shall not be considered a Federal employee and shall not be subject to the provision of laws relating to Federal employment.").

Two federal district courts have determined that AmeriCorps participants are not employees for purposes of Title VII claims. *See Murray v. American Red Cross*, Case No. 4:07cv161-RH/WCS, 2008 U.S. Dist. LEXIS 112052, at * 1, * 5 (N.D. Fl. Jan. 1, 2008) (AmeriCorps participant not an employee covered by Title VII); *Rodriguez v. Corp. for National Community Service*, No. EP-09-CA-041-FM, 2009 U.S. Dist. LEXIS 67534, at *12-13 (W.D. Tx. June 23, 2009) (agreeing with and adopting analysis in *Murray*, which held an AmeriCorps participant was not an employee for purposes of Title VII employment discrimination claims). The definition of "employer" set out in the ADA is identical to that contained in Title VII. *Compare* 42 U.S.C. § 12111(5)(A)(ADA) *with* 42 U.S.C. § 2000e(b) (Title VII). The Tenth Circuit Court of Appeals and other courts have applied the analyses in Title VII cases to cases brought under the ADA. *See Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1155-56 (10th Cir. 2004) (citing *Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1164 (10th Cir.) (noting definition of employer substantially similar and applying Title VII cases in ADA context), *vacated in part on other grounds by* 312 F.3d 1213 (10th Cir. 2002) (*en banc*); *Butler v. City of Prairie Village, Kansas*, 172 F.3d 736, 744 (10th Cir. 1999) (noting reasons for precluding individual liability under Title VII apply equally to ADA); *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1230 (10th Cir. 1997) ("Congress' decision to incorporate in the ADA the remedies and procedures of Title VII cases is a clear indication, we think, that the statutory intent requirement for injunctive relief should be applied in harmony under the two acts."); *Brown v. Brody*, 199 F.3d 446, 456 n. 10 (D.C. Cir. 1999) (listing cases) ("Courts of appeals routinely apply the same standards to evaluate Title VII claims as they do ADA claims. . . ."), *abrogated on other grounds by Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008); *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 n. 2 (6th Cir. 1997) ("Because Title VII, the ADEA,

and the ADA define 'employer' essentially the same way, we rely on case law developed under all three statutes." (internal quotation marks and citation omitted)).

Ms. Self concedes that AmeriCorps volunteers cannot be considered employees of CIHAD. (*See* Response (Doc. # 89) at 61 of 95). Rather, Ms. Self argues that AmeriCorps volunteers must be students in order to qualify for the AmeriCorps program and that the AmeriCorps volunteers at CIHAD were not truly AmeriCorps volunteers because they were not students and thus did not properly qualify for the program. None of the AmeriCorps volunteers placed at CIHAD in 2008 were full-time students, nor were they required to be. (*See* Doc. # 86-1 at ¶ 5; Doc. # 86-10 at ¶ 7; Doc. # 94-1 at ¶ 3; 42 U.S.C. § 12591(a)). Ms. Self's conclusory belief that CIHAD's AmeriCorps volunteers were required to be students does not refute the substantiated evidence and legal authority that AmeriCorps participants need not be students. (*See id.*).

Ms. Self further argues that the AmeriCorps program sponsored by CCC is under Division B of the National Community Service State Grant Program, 42 U.S.C. § 12513, and thus placing AmeriCorps volunteers at CIHAD was improper. The evidence does not support Ms. Self's conclusory argument. AmeriCorps volunteers were provided to CIHAD pursuant to Division C of the National Community Service State Grant Program, 42 U.S.C. § 12571. (*See* Affidavit of Stephanie Schooley dated July 2, 2012, Exhibit G to Reply (Doc. # 94-10 at ¶ 2)). Ms. Self appears to confuse "Division C, which deals with the National Service Trust Program, with Division B, relating to School Based and Community Based Learning Programs, an entirely different portion of the AmeriCorps program . . . ." (*See* Doc. # 94-1 at ¶ 2).

Ms. Self also argues that the AmeriCorps volunteers at CIHAD were not truly AmeriCorps volunteers because they were not distinguished on CIHAD's payroll or accounting records. The only financial benefits AmeriCorps volunteers are eligible to receive are the educational awards upon successful completion of service and a living allowance. *See* 45 C.F.R. § 2522.240. AmeriCorps volunteers at CIHAD were paid an annual living allowance in 2008 of $10,000 initially and $11,000 commencing in September of 2008. (*See* Affidavit of Mary Hanewall dated June 29, 2012, Exhibit H to Reply (Doc. # 94-2 at ¶ 1). These amounts were paid to the

AmeriCorps volunteers on a bi-monthly basis and were not related to the number of hours the volunteers served. (*See id.*). The living allowance itself is "not a wage" nor is it paid on an hourly basis. *See* 45 C.F.R. § 2522.245. *See also* November 18, 1998 Opinion Letter of the United States Department of Labor, Exhibit I to Reply (Doc. # 94-3) (since AmeriCorps volunteers are not "employees" by statute, they are not covered by the provisions of the Fair Labor Standards Act). CIHAD receives no direct AmeriCorps funding to pay for volunteers' living allowances. "The funding for the living allowance paid to AmeriCorps volunteers came from CIHAD's general account." (*See id.* at ¶ 2). CIHAD receives only limited pass through funding from CCC associated with its acceptance of AmeriCorps volunteers to cover the administrative expenses and training for AmeriCorps volunteers serving at CIHAD. (*See* Doc. # 94-2 at ¶ 5; Doc. # 94-1 at ¶ 7; Doc. # 86-10 at ¶ 5). CIHAD receives no other funding from CCC or Regis University and the funds that it does receive are not utilized for payment of the AmeriCorps volunteers' living allowance. (See id.). Ms. Self's argument regarding the inclusion of the living allowance payments to AmeriCorps volunteers on CIHAD's payroll records is not probative of whether AmeriCorps volunteers are employees of CIHAD.

  Ms. Self argues that, in response to her inquiries, individuals at Regis University's Office of Academic Grants were unable to locate a connection between Regis University's AmeriCorps grant and CIHAD. (*See* Response (Doc. # 89) at 66 of 95). Ms. Self's representation that an employee in the Office of Academic Grants "could not find anything" does not refute the evidence of CIHAD's relationship as a sub-grantee and a service site for AmeriCorps. The Academic Grants Office at Regis University would not likely have access to CCC's records of the sub-grantees and service sites with whom CCC partners. (*See* Doc. # 94-1 at ¶ 7). The competent evidence shows that CCC has a long-standing relationship placing AmeriCorps volunteers at CIHAD. (See Doc. # 94-1 at ¶ 4).

  Finally, Ms. Self argues that if CIHAD's AmeriCorps volunteers were legitimate AmeriCorps volunteers, there should be some sort of "audit trail" or other financial documents reflecting the payments the volunteers receive. The evidence shows that the funding of the education awards earned by AmeriCorps volunteers goes directly from the National Corporation

to the volunteers themselves. (See Doc. # 94-1 at ¶ 7). Neither CCC nor CIHAD is involved in those payments, nor is there any audit trail or other documentation kept by either entity with regard to those payments. (*See id.*; Doc. # 94-2 at ¶ 4). Regis University and CCC have been, and are, in full compliance with the requirements for the grant funds that they administer and no improprieties have ever been suggested or found with regard to the relationship between CCC and CIHAD. (*See* Doc. # 94-1 at ¶ 8).

> For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment. [E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal quotation marks and citations omitted). Ms. Self's burden in responding to Defendant's Motion is to designate specific facts demonstrating a genuine issue of fact for trial with respect to her claims. Defendant has presented substantial evidence and legal authority that CIHAD's AmeriCorps volunteers were not employees and that CIHAD had fewer than 15 employees in 2008, the time period relevant to Ms. Self's claims. Ms. Self presents merely her conclusory opinions without sufficient evidence to create a genuine issue of fact that CIHAD's AmeriCorps volunteers were employees. (*See, e.g.,* Doc. # 89 at 60-93 of 95; 71 of 95 ("Plaintiff does not claim to be an expert on how to actually type the statute and seeing that the Court previously could not find within that statu[t]e that the participants are required to be students she is not going to rely on her ability to type the statutes and regulation codes;" 74 of 95 ("I do not know for certain that the auditor was identifying the AmeriCorps members specifically at CIHAD . . ."); Doc. # 90 at 132-52 of 202). Ms. Self's conclusory arguments do not demonstrate that CIHAD had 15 or more employees for each working day in each of 20 or more calendar weeks in 2008 and are thus insufficient to establish that CIHAD meets the definition of an employer under the ADA. Ms. Self acknowledges that, excluding the AmeriCorps volunteers, CIHAD did not employ fifteen employees in 2008, or at any other time. (*See* Doc. # 86-1 at ¶ 6; Doc. # 86-4 at 4-8 of 25). Because CIHAD was not an employer under the ADA, Defendant is entitled to summary judgment on both of the Causes of Action in the SAC.

B.      Exhaustion of Administrative Remedies as Jurisdictional Prerequisite

Defendant further moves for summary judgment on Ms. Self's claims based on her failure to exhaust her administrative remedies. Defendant argues that Ms. Self did not exhaust her retaliation claim because she failed to include allegations of retaliation in the Charge of Discrimination filed with the EEOC. Defendant also argues that Ms. Self did not exhaust either of her claims because she failed to timely file her Charge of Discrimination with the EEOC.

As a threshold issue, a plaintiff must exhaust certain administrative remedies in order to file an ADA claim in federal court. *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(e)(1)). "Title I of the ADA requires a plaintiff to exhaust her administrative remedies before filing suit." *Jones v. United Parcel Service, Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (citation omitted). "In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Id.* (citations omitted). *See also MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) ("In the tenth circuit, a plaintiff must exhaust her claims before the EEOC as a prerequisite to federal court jurisdiction over her ADA claims.") (citation omitted). There are two steps to determine whether a plaintiff has exhausted her administrative remedies: "[t]he first step . . . is the filing of a charge of discrimination with the EEOC" and the second step "is to determine the scope of the allegations raised in the EEOC charge." *Jones*, 502 F.3d at 1186.

1.     Exhaustion of Retaliation Claim

A Charge of Discrimination filed with the EEOC "must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows from the rule that each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Jones*, 502 F.3d at 1186 (quoting *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (internal quotation marks omitted). In determining whether a plaintiff has exhausted his or her administrative remedies, the court must "determine the scope of the allegations raised in the EEOC charge because [a] plaintiff's claim in federal court is generally limited by the scope of the administrative

investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones*, 502 F.3d at 1186 (internal quotation marks and citation omitted). *See also MacKenzie*, 414 F.3d at 1274 (same); *Martinez*, 347 F.3d at 1210 (a complaint may only include those claims which were explicitly raised in the administrative charge with the EEOC and "any discrimination like or reasonably related to the allegations of the EEOC charge") (internal quotation marks and citation omitted). While charges filed with the EEOC are liberally construed, the inquiry is nevertheless "limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory *acts* alleged in the administrative charge." *Jones*, 502 F.3d at 1186 (emphasis in original). "In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; . . ." *Id.*

> Ms. Self filed a Charge of Discrimination with the EEOC on August 17, 2009, alleging:
>
> I was hired on or about November 29, 200, as the Office Manager, I performed my duties in a satisfactory manner. In approximately July 2009, I was diagnosed with my disability. I disclosed my disability to the Executive Director. I was able to perform the essential functions of my position. I did need assistance when I had to lift or carry a large or heavy item and did the office grocery shopping. This upset the Executive Director and she started to treat me in a rude and unprofessional manner. on or about October 13, 2008, I learned that I had been 'locked' out of the company database. This upset me, so I left work. I tried to call back to my office phone to pick up messages but I was not able to retrieve and/or access my phone and/or messages. on or about October 14, 2008, I called in sick to work. Later that afternoon I found a letter in my door indicating that I had been discharged from my position on October 13, 2008. There was also a Release included that reflected if I signed it the company would pay my health insurance for the next six months. I did not sign the release form. The Executive Director called my cell phone several times and left messages inquiring if I had signed the Release. When I did not call her back she called me and left a message stating that she was going to stop payment on my vacation pay out if I didn't call her back. I did not call her and eventually deposited the check. ~~To date I have not been allowed to come and pick up my personal belongings~~ [sic].
>
> I believe that I have been discriminated against due to my disability within the meaning of the Americans with Disabilities Act of 1990, as amended.

(*See* Charge of Discrimination, Exhibit E to Defendant's Motion (Doc. # 86-7)).

The evidence demonstrates and Ms. Self does not dispute that she did not include allegations of retaliation in the Charge of Discrimination. Ms. Self marked only the box "Disability" as the basis for the alleged discrimination. (*See* Doc. # 86-7; Doc. # 90 at 153-54 of 202). Ms. Self did not check the box on her EEOC Charge of Discrimination asserting

retaliation. (*See* Doc. # 86-7; Doc. # 90 at 155-56 of 202). "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." *Jones*, 502 F.3d at 1186 (citation omitted). *See also Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1998) (failure to check the retaliation box creates a presumption that plaintiff did not assert a retaliation claim). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." *Id.* In the text of her charge, Ms. Self identified only her disability and did not indicate that she was discriminated against based on retaliation. (*See* Doc. # 86-7; Doc. # 90 at 155-56 of 202).

Based on Ms. Self's Charge of Discrimination, any investigations and determinations either addressed or would reasonably be expected to have addressed her charge of disability discrimination. *See Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990) (proper scope of a complaint in federal court is determined from the EEOC administrative charge and any actual investigation or any investigation which could reasonably have been expected to occur as a result of the charge). Ms. Self's Charge of Discrimination cannot fairly be construed to encompass the claim of retaliation contained in the SAC. *See Leong v. Potter*, 247 F.3d 1117, 1122 (9th Cir. 2003) (disability claim not reasonably related to Title VII claims presented to the EEOC); *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1224-25 (11th Cir. 2000) (retaliation claim not reasonably related to claim of discrimination based on disability); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409-10 (10th Cir. 1997) (wrongful discharge allegations not reasonably related to hostile environment allegations); *Mawson v. U.S. West Business Resources, Inc.*, 23 F. Supp. 2d 1204, 1215-17 (D. Colo. 1998) (administrative charge containing only allegations of disability discrimination did not give defendants notice of any hostile environment or other Title VII claims).

As Ms. Self's retaliation claim raises matters unrelated to her Charge of Discrimination, this court's jurisdiction does not extend to her Second Cause of Action alleging retaliation. Defendant is entitled to summary judgment on the Second Cause of Action.

    2.    Defendant's Additional Arguments Regarding Timeliness of Charge of Discrimination, Qualifying Disability, Failure to Accommodate, Non-Discriminatory

Reasons for Termination, Protected Activity, Hostile Work Environment.

As the evidence before the court demonstrates that CIHAD is not an employer for purposes of the ADA and that Ms. Self failed to include a retaliation claim in the Charge of Discrimination filed with the EEOC, CIHAD is entitled to summary judgment on the claims in the SAC and the court need not reach at this time CIHAD's additional arguments that Ms. Self did not timely file her Charge of Discrimination with the EEOC and cannot establish: that she has a qualifying disability under the ADA, that CIHAD failed to accommodate any disability, that Defendant's proffered legitimate, non-discriminatory reasons for terminating her employment were a pretext for discrimination based on her disability, that she was terminated in retaliation for any protected activity, or the existence of a hostile work environment. Accordingly,

IT IS RECOMMENDED that Defendant's Motion to Dismiss and/or for Summary Judgment (filed May 3, 2012) (Doc. # 86) be GRANTED and that summary judgment enter on the Second Amended Complaint (Doc. # 34) in favor of Defendant and against Plaintiff.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th

Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 4th day of February, 2013.

BY THE COURT:

   s/Craig B. Shaffer
United States Magistrate Judge